## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

JAZMIN ESCOBAR, in her capacity as
beneficiary of the Estate of Jose Escobar,
1357 Alderton Ln
Silver Spring, MD 20906
County of Residence: Montgomery County

JOSH KRUMPACH, and
174 Brandenburg Dr
Falling Waters, WV 25419

CHRIS TURGEON,
4 Tacoma St
Thurmont, MD 21788
County of Residence: Frederick County

on behalf of the JJF Management Services,
Inc. Employee Stock Ownership Plan, and on
behalf of a class of all other persons similarly
situated,

        Plaintiffs,

    v.

BOARD OF DIRECTORS OF J.J.F.
MANAGEMENT SERVICES, INC.,
11411 Rockville Pike
Rockville, MD 20850
County of Residence: Montgomery County

MARIANNA F. HEETER, as Administrator
of the Estate of Richard A. Heeter,
112 Kim Acres Dr
Mechanicsburg, PA 17055

CAPITAL TRUSTEES, LLC,
112 Kim Acres Dr
Mechanicsburg, PA 17055

DOROTHY M. FITZGERALD, in her
personal capacity and in her capacity as

CIVIL ACTION NO.

**CLASS ACTION COMPLAINT**

JURY TRIAL DEMANDED

personal representative of the Estate of John J.
Fitzgerald, Jr.,
9624 Glencrest Ln
Kensington, MD 20895
County of Residence: Montgomery County

JOHN J. FITZGERALD, III,
13044 Gordon Circle
Hagerstown, MD 21742
County of Residence: Washington County

WALTER SKIPPER,
1035 Upper Ridgeway
Elm Grove, WI 53122

JAMES W. CASH,
14720 Tudor Chase Dr
Tampa, FL 33626

GREGG STEINBARTH,
11710 Old Georgetown Rd Apt 1511
North Bethesda, MD 20852
County of Residence: Montgomery County,

MARGARET M. FITZGERALD,
12006 Gatewater Dr
Potomac, MD 20854
County of Residence: Montgomery County

KATHLEEN ICEBERG,
6711 Ilex Ct
New Market, MD 21774
County of Residence: Frederick County

ROBERT M. SMITH, JR., and
14121 Heritage Ln
Silver Spring, MD 20906
County of Residence: Montgomery County

DAVID JENKINS,
11411 Rockville Pike
Rockville, MD 20850
County of Residence: Montgomery County

                        Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Plaintiffs Jazmin Escobar, in her capacity as beneficiary of the Estate of Jose Escobar, Josh Krumpach, and Chris Turgeon ("Plaintiffs") on behalf of all others similarly situated and the JJF Management Services, Inc. Employee Stock Ownership Plan ("JJF ESOP" or "the ESOP" or "the Plan"), state and allege as follows:

## I.      NATURE OF ACTION

1.      This is a civil enforcement action brought pursuant to Sections 502(a)(2) and 502(a)(3) of the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1132(a)(2)-(3) on behalf of participants and beneficiaries of the ESOP.

2.      The JJF ESOP is an ERISA-protected retirement plan whereby the individual retirement accounts of current and former employees are invested entirely in the stock of J.J.F. Management Services, Inc. ("JJF" or the "Company"), a family-owned auto-dealership that began in Bethesda, Maryland.

3.      In summary, Plaintiffs allege that Capital Trustees, LLC and Richard A. Heeter (now deceased and named via Marianna F. Heeter as the personal representative of his Estate) (the "Trustee Defendants"), the Company's Board of Directors (Dorothy M. Fitzgerald, in her personal capacity and in her capacity as personal representative of the Estate of John J. Fitzgerald, Jr., John J. Fitzgerald, III, Walter Skipper, James W. Cash, and Gregg Steinbarth (collectively, the "Board Defendants")), and the "Successor Trustee Defendants" (Robert M. Smith, Jr., David Jenkins, and Gregg Steinbarth) caused ERISA prohibited transactions whereby the ESOP purchased the Company from the Sellers at inflated purchase prices and borrowed money from the Sellers (collectively, the "Transaction"), which prohibited transactions continued through ongoing loan payments to the Seller Defendants after the sale.

4.      On or around January 31, 2023, the Trustee Defendants caused the ESOP to acquire 1,000,000 shares of JJF common stock from the Seller Defendants for approximately $442 million,

which exceeded the fair market value of those shares.

5.    According to financial statements filed by the ESOP with the Department of Labor, the value of the JJF shares was just $13.4 million on the same day the shares were purchased by the ESOP (Jan 31, 2023), which is just 3% of the price paid to the Seller Defendants: $442 million.

6.    A year later the JJF stock was till only worth $46.45 million, just 10% of what the ESOP paid one year after it was purchased from the Sellers.

7.    The employee-participants, who would be forced to purchase the JJF shares through their retirement accounts, were not allowed to negotiate the Transaction price or any of its terms. In fact, the employee-participants had no input on the terms agreed to by the Trustee Defendants and the Seller Defendants. Nor did the employees consent to the terms of the Transaction.

8.    A proper valuation of the Transaction would have accounted for several important risk factors that limited the value of the Company at the time of sale, including that new and used car prices were at unsustainably high levels—the result of COVID-19 related supply chain disruptions—which would not last forever. Moreover, a proper valuation also would have accounted for the manner in which the Transaction was structured, such that (i) the Seller Defendants would keep control over a majority of the Company's Board seats; (ii) the Seller Defendants created a governance structure such that, immediately after the Transaction, the ESOP trustee role was transferred to Company insiders who were beholden to the Fitzgerald family; (iii) almost the entire purchase price was financed through loans which were either guaranteed by the Company or issued directly by the Company to the ESOP; and (iv) the Company was financially burdened with the obligation to make contributions to the ESOP sufficient to make the necessary loan payments, including principal and interest payments to the Seller Defendants.

9.    The Trustee Defendants and the Seller Defendants did not give adequate

consideration to these and other factors in determining the sale price for the Company. To the contrary, the Seller Defendants were focused on promoting the Company's value for their own financial benefit, including as an estate planning vehicle. The Trustee Defendants failed to ensure that the ESOP paid no more than fair market value because they did not sufficiently adjust management projections to account for the COVID-based anomalous financial results; did not ensure that the price the ESOP paid was appropriately discounted based on the fact that the Seller Defendants retained the right to appoint a majority of the Board; and that, immediately after the Transaction, the ESOP trustee role was transferred to Company insiders who were beholden to the Fitzgerald Family.

10.     The Trustee Defendants and the Successor Trustee Defendants had a fiduciary duty under ERISA to act prudently and in the sole interest of ESOP participants, *see* 29 U.S.C. § 1104(a)(1)(A)-(B), and also had a duty to ensure that the ESOP did not engage in prohibited transactions, *see* 29 U.S.C. § 1106. The Board Defendants similarly had a fiduciary duty to install an appropriate governance structure to ensure that the Trustee Defendants complied with their fiduciary responsibilities. In particular, because the Board appointed the Trustee Defendants, the Board Defendants had a duty to monitor the Trustee Defendants and to ensure that they did not engage in prohibited transactions with the ESOP.

11.     Based on the foregoing allegations and the other allegations set forth below, Defendants have breached their fiduciary duties and caused the ESOP to engage in prohibited transactions with the Seller Defendants, resulting in substantial losses to the ESOP and Plaintiffs' ESOP accounts. Plaintiffs bring this action pursuant to ERISA §§ 409(a) and 502(a)(2)-(3), 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3), to restore these losses to the Plan, disgorge the monies that the Seller Defendants unlawfully obtained in connection with the Transaction, remove the

Successor Trustees from their role as ESOP Trustee, and obtain other appropriate equitable relief and other available relief.

## II.    JURISDICTION AND VENUE

12.    **Subject Matter Jurisdiction**. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(a), 29 U.S.C. § 1132(a).

13.    **Personal Jurisdiction.** This Court has personal jurisdiction over Defendants because they transact business in, and have significant contacts with, this district.

14.    **Venue**. Venue is proper in this district pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2) for at least the following reasons:

  a.    Defendants' alleged breaches of fiduciary duty took place in this District at the Company's headquarters located in Rockville, Maryland;

  b.    Several of the Defendants, including Fitzgerald family members, reside in this District; and

  c.    Plaintiffs Escobar and Turgeon reside in this District.

## III.    PARTIES

### A.    <u>Plaintiffs</u>

15.    **Plaintiff Jazmin Escobar** is the daughter of Jose Escobar, who was employed by Fitzgerald Auto Mall, Inc., a subsidiary of JJF, and is a beneficiary of his estate. Plaintiff Jazmin Escobar resides in Silver Spring, Maryland. Jose Escobar was a Plan participant since the effective date of the Plan, August 1, 2021. Jose Escobar, who worked as an autobody technician at Fitzgerald Auto Mall, Inc., resided in Silver Spring, Maryland and passed away on March 10, 2025. Upon information and belief, Mr. Escobar worked at the Company for approximately 12 years until December 2023. At the time of his death, he was 100% vested in shares of JJF in his Plan account.

16.    **Plaintiff Josh Krumpach** is and has been a Plan participant since the effective date of the Plan, August 1, 2021. Plaintiff resides in Falling Waters, West Virginia. In his most recent

position, he was a Director of Services at Fitzgerald Auto Mall, Inc. He was employed there from on or about February 2004 through March 2023. At the time he left employment at JJF, he was 100% vested in shares of JJF in his Plan account.

17.     **Plaintiff Chris Turgeon** is and has been a Plan participant, as defined in ERISA § 3(7), 29 U.S.C. § 1002(7), since the effective date of the Plan, August 1, 2021. Plaintiff Chris Turgeon resides in Thurmont, Maryland. He was a Service Manager at Fitzgerald Auto Mall, Inc., a subsidiary of JJF. He was employed there from on or about June 2013 to August 2023. At the time he left employment at JJF, he was 100% vested in shares of JJF in his Plan account.

**B.     Trustee Defendants**

18.     **Defendant Marianna F. Heeter** is personal representative for the Estate of Richard A. Heeter. She currently is listed as the governor for Capital Trustees, LLC and is thus responsible for overseeing its operations and making company decisions. On information and belief, she is a member of Capital Trustees, LLC.

19.     Richard A. Heeter died on October 4, 2024. Prior to then, he was the Governing Member of Capital Trustees, LLC. Mr. Heeter was the trustee of the ESOP from July 31, 2022 through the Transaction. As the discretionary trustee responsible for approving the Transaction, Richard A. Heeter had discretion to authorize and negotiate the Transaction on behalf of the ESOP. The ESOP's Trust Agreement named Richard A. Heeter as ESOP trustee.

20.     Mr. Heeter was a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) because he was the trustee within the meaning of ERISA § 403(a), 29 U.S.C. § 1103(a), and because he exercised discretionary authority or discretionary control respecting management of the Plan, and exercised authority or control respecting management or disposition of the Plan's assets.

21.     **Defendant Capital Trustees, LLC** ("CapTrustees") is a Pennsylvania Limited

Liability Company founded in 2012. CapTrustees bills itself as "an independent trustee and fiduciary" that "serves as ongoing trustee to over 40 ESOP companies" and "serves as transaction trustee." CapTrustees' headquarters is at 112 Kim Acres Dr., Mechanicsburg, PA 17055.

22.    Defendant CapTrustees was at all relevant times Richard A. Heeter's company and acted as a *de facto* trustee of the ESOP through the time of the Transaction. CapTrustees provides a team to execute ESOP transactions, office space, a routine due diligence process, and insurance. CapTrustees advertises: "The professional team at Capital Trustees has extensive business experience, which allows them to efficiently and effectively fulfill their fiduciary duties." In practice, CapTrustees acted in the ESOP Transaction through Richard A. Heeter and negotiated and approved the Transaction on behalf of the ESOP.

23.    CapTrustees' website mentions several ESOP Transactions in which it "served as Independent Trustee" of an ESOP, but its "About" page lists only one person—Richard Heeter. The "Contact" page of CapTrustees' website directs visitors to only one email address: Rich@CapTrustees.com. The CapTrustees website links to a social media account on X (formerly known as Twitter), which leads to an account with the username @CapTrustees and display name of "Capital Trustees Rich Heeter," and the profile picture is a photo of Rich Heeter. CapTrustees and Rich Heeter are interchangeable when Rich Heeter serves as the trustee to an ESOP.

24.    On information and belief, the Company appointed Rich Heeter to be ESOP Trustee in his individual capacity rather than appointing CapTrustees merely because CapTrustees is not a registered trust company and the Company paid the trustee services fee to CapTrustees, not to Rich Heeter in his personal capacity.

25.    CapTrustees was a fiduciary of the ESOP within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A) from the early planning stages of the Transaction and up through when

it (including Heeter) approved the Transaction because CapTrustees exercised discretionary authority or discretionary control respecting management of the ESOP, and/or exercised authority or control respecting management or disposition of the ESOP's assets.

26.     Pursuant to the Plan Document, the ESOP's assets were invested and controlled by the Trustee, which, in practice, was Mr. Heeter and CapTrustees from the Transaction-planning stages up through its consummation.

27.     Richard A. Heeter (named via his Estate) and CapTrustees are together referred to as the **"Trustee Defendants"** throughout this complaint.

### C.     Board Defendants

28.     **Defendant JJF Board of Directors** and its members (collectively "the Board Defendants") are named fiduciaries under the ESOP Plan Document.

29.     The ESOP Plan Document grants the Board Defendants the power to select, retain, and remove the ESOP Trustee and ESOP Committee members and the responsibility for reviewing their performance. The Board Defendants appointed Richard A. Heeter as ESOP Trustee, and Mr. Heeter's agreement gave the Board Defendants the power to remove him with or without cause.

30.     **John J. Fitzgerald, Jr. ("Jack Fitzgerald")** was the founder and principal owner of JJF. Jack Fitzgerald was the largest shareholder of the Company and sold his shares to the ESOP. He was the Company's President and Chairman of the Board of Directors immediately prior to the Transaction. Jack Fitzgerald continued to serve as President until September 2023 and remained Executive Chairman of the Board until his death.

31.     As the Chairman of the JJF Board, Jack Fitzgerald signed the Trust Agreement appointing Richard A. Heeter as the Trustee of the ESOP prior to the Transaction and appointing Robert M. Smith, Jr., David Jenkins, and Gregg Steinbarth as the ESOP Trustees immediately after the Transaction. Due to his role in those appointments, he had a duty to monitor each of the ESOP

Trustees to ensure they were fulfilling their duties to the ESOP and ensuring that the ESOP did not pay more than fair market value for JJF stock.

32.     Jack Fitzgerald was a named fiduciary to the ESOP within the meaning of 29 USC § 1102(a)(2) and a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) from the early planning stages of the Transaction and up until his death because he exercised discretionary authority or discretionary control respecting management of the ESOP, and/or exercised authority or control respecting management or disposition of the ESOP's assets.

33.     Jack Fitzgerald was also a "party in interest" to the ESOP as defined in ERISA § 3(14)(A), (F), (H), 29 U.S.C. § 1002(14)(A), (F), (H).

34.     **Defendant John J. Fitzgerald, III** was a co-owner of the Company who sold his shares to the ESOP. He is Jack Fitzgerald's son and a member of the JJF Board (and its predecessor) from the planning stages for the ESOP Transaction and through its consummation.

35.     As a Director, John Fitzgerald, III appointed Richard A. Heeter as ESOP Trustee prior to the Transaction and appointed Robert M. Smith, Jr., David Jenkins, and Gregg Steinbarth as the ESOP Trustees immediately after the Transaction. Due to his role in those appointments, he had a duty to monitor each of the ESOP Trustees to ensure they were fulfilling their duties to the ESOP and ensuring that the ESOP did not pay more than fair market value for JJF stock.

36.     John Fitzgerald, III is the sole member of the ESOP Voting Committee and an ERISA fiduciary because he has the power—under the ESOP's Plan Document—to direct the Trustee how to vote for up to three (3) members of the Company's Board of Directors.

37.     John J. Fitzgerald, III was a named fiduciary to the ESOP within the meaning of 29 U.S.C. § 1102(a)(2) and a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because he exercised discretionary authority or discretionary control respecting

management of the ESOP and/or exercised authority or control respecting management or disposition of the ESOP's assets.

38.     John J. Fitzgerald, III is also a "party in interest" to the ESOP as defined in ERISA § 3(14)(A), (F), (H), 29 U.S.C. § 1002(14)(A), (F), (H).

39.     **Defendant Dorothy M. Fitzgerald** was a co-owner of the Company who sold her shares to the ESOP. She is Jack Fitzgerald's sister and serves as the personal representative of the Estate of John J. Fitzgerald, Jr. Whe was a Board member of JJF (and its predecessor) from the planning stages for the ESOP Transaction and through its consummation.

40.     As a Director, Dorothy M. Fitzgerald appointed Richard A. Heeter as ESOP Trustee prior to the Transaction and appointed Robert M. Smith, Jr., David Jenkins, and Gregg Steinbarth as the ESOP Trustees immediately after the Transaction. Due to her role in those appointments, she had a duty to monitor each of the ESOP Trustees to ensure they were fulfilling their duties to the ESOP and ensuring that the ESOP did not pay more than fair market value for JJF stock.

41.     Dorothy M. Fitzgerald as a Board member was a named fiduciary to the ESOP within the meaning of 29 U.S.C. § 1102(a)(2) and a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because she exercised discretionary authority or discretionary control respecting management of the ESOP, and/or exercised authority or control respecting management or disposition of the ESOP's assets.

42.     Dorothy M. Fitzgerald is also a "party in interest" to the ESOP as defined in ERISA § 3(14)(A), (F), (H), 29 U.S.C. § 1002(14)(A), (F), (H).

43.     **Defendant Walter Skipper** was a JJF Board member and a Board Representative at all relevant times and, like all Board members, had the powers and responsibility assigned to the Board in the ESOP Plan Document.

44.     As a member of the Board, Walter Skipper appointed Mr. Heeter as ESOP Trustee prior to the Transaction and appointed Robert M. Smith, Jr., David Jenkins, and Gregg Steinbarth as the ESOP Trustees immediately after the Transaction. Due to his role in those appointments, Mr. Skipper had a duty to monitor each of the ESOP Trustees to ensure they were fulfilling their duties to the ESOP and ensuring that the ESOP did not pay more than fair market value for JJF stock.

45.     Walter Skipper was a named fiduciary to the ESOP within the meaning of 29 U.S.C. § 1102(a)(2) and a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because he exercised discretionary authority or control respecting management of the ESOP and/or exercised authority or control respecting management or disposition of the ESOP's assets.

46.     **Defendant James W. Cash** ("Bill Cash") was an owner of JJF stock prior to the ESOP Transaction. Mr. Cash sold his stock to the ESOP in the ESOP Transaction.

47.     Bill Cash was Jack Fitzgerald's stepson and was a member of the Board of Directors prior to the ESOP Transaction. On information and belief, he remains on the Board.

48.     As a member of the Board, Bill Cash appointed Richard A. Heeter as Trustee of the ESOP prior to the Transaction and appointed Robert M. Smith, Jr., David Jenkins, and Gregg Steinbarth as Trustees immediately after the Transaction. Due to his role in those appointments, Mr. Cash had a duty to monitor each of the ESOP Trustees to ensure they were fulfilling their duties to the ESOP and ensuring that the ESOP did not pay more than fair market value for JJF stock.

49.     Bill Cash was a named fiduciary within the meaning of 29 U.S.C. § 1102(a)(2) and a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because he exercised discretionary authority or discretionary control respecting management of the ESOP

and/or exercised authority or control respecting management or disposition of the ESOP's assets.

50.     Bill Cash is also a "party in interest" to the ESOP as defined in ERISA § 3(14)(A), (H), 29 U.S.C. § 1002(14)(A), (H).

51.     **Defendant Gregg Steinbarth** has worked at the Company since 1999. He is the Company's General Counsel.

52.     Gregg Steinbarth was a JJF Board member and Board Representative at all relevant times and, like all Board members, was responsible for "making decisions with respect to amending or terminating the Plan; making decisions with respect to the selection, retention, or removal of the Trustee and the ESOP Committee; periodically reviewing the performance of the Trustee, the members of the ESOP Committee and persons to whom duties have been allocated or delegated, and determining the form and amount of contributions," under the terms of the Plan.

53.     As a Director, Gregg Steinbarth appointed Richard A. Heeter as ESOP trustee prior to the Transaction and appointed Robert M. Smith, Jr., David Jenkins, and himself as the ESOP Trustees immediately after the Transaction. Due to his role in those appointments, Mr. Steinbarth had a duty to monitor each of the ESOP Trustees to ensure they were fulfilling their duties to the ESOP and ensuring that the ESOP did not pay more than fair market value for JJF stock.

54.     Mr. Steinbarth was a named fiduciary within the meaning of 29 U.S.C. § 1102(a)(2) and a *de facto* fiduciary within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) because he exercised discretionary authority or discretionary control respecting management of the ESOP and/or exercised authority or control respecting management or disposition of the ESOP's assets.

### D.     Seller Defendants

55.     "Seller Defendants" refers to the Estate of Jack Fitzgerald, Dorothy M. Fitzgerald, John J. Fitzgerald, III, Bill Cash, Margaret M. Fitzgerald, and Kathleen Iceberg.

56.     **Defendant Margaret M. Fitzgerald** was an owner of JJF stock prior to the ESOP

Transaction. Margaret M. Fitzgerald sold her stock to the ESOP in the ESOP Transaction. Margaret M. Fitzgerald is Jack Fitzgerald's ex-wife and the mother of John J. Fitzgerald, III and Kathleen Iceberg.

57.     At the time of the Transaction, Margaret M. Fitzgerald knew that her ex-husband was a director and executive of JJF and that her son was a director and that they both also sold stock to the ESOP in the ESOP Transaction.

58.     **Defendant Kathleen Iceberg** was an owner of JJF stock prior to the ESOP Transaction. Iceberg sold her JJF stock to the ESOP in the ESOP Transaction. She is the daughter of Jack Fitzgerald and sister of John Fitzgerald III.

59.     At the time of the Transaction, Ms. Iceberg knew her father was a director and executive of JJF, her brother was a director, and that they/she sold stock to the ESOP.

60.     Kathleen is a "party in interest" to the ESOP as defined in ERISA § 3(14)(F), 29 U.S.C. § 1002(14)(F).

### E.     Successor Trustee Defendants

61.     **Defendants Robert M. Smith, Jr., David Jenkins, and Gregg Steinbarth** have been ESOP Trustees since immediately after the ESOP purchased Company stock. They have the power to vote the ESOP's shares on matters for which the ESOP Voting Committee does not provide direction. They also control all ESOP plan assets.

62.     Defendants Smith, Jenkins, and Steinbarth are named fiduciaries to the ESOP within the meaning of 29 U.S.C. § 1102(a)(2) and *de facto* fiduciaries within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21) starting immediately after the Transaction because they exercised discretionary authority or discretionary control respecting management of the ESOP and/or exercised authority or control respecting management or disposition of the ESOP's assets.

63.     Robert M. Smith, Jr. has worked at the Company since 1989. At the time of the

- 12 -

ESOP Transaction, Smith was Vice President of the Company. He became President of the Company on September 22, 2023. As part of the Transaction, Defendant Smith received substantial synthetic equity, which incentivized him to inflate the projections used to value the Company and to keep control through his role as ESOP trustee immediately after the Transaction.

64.     David Jenkins has worked at the Company since 1987. At the time of the ESOP Transaction, Jenkins was Vice President of Operations and since September 22, 2023, he has been the Chief Operating Officer. As part of the Transaction, Defendant Jenkins received substantial synthetic equity, which incentivized him to inflate the projections used to value the Company and to keep control through his role as ESOP trustee immediately after the Transaction.

65.     Gregg Steinbarth has worked at the Company since 1999. He was and is the Company's General Counsel, a member of the Board of Directors, and a Seller (see above). He was incentivized to ensure the Transaction closed which provided a substantial payout for him on his JJF shares, provided the opportunity to award himself additional synthetic equity (as a Board member), and keep control over JJF as an ESOP trustee immediately after the Transaction.

66.     Defendant Smith stated that Jack Fitzgerald wanted an "exit strategy" which "allow[ed] him to continue his brand with the leadership team that he really looks at as family." Defendants Smith, Jenkins, and Steinbarth are the leadership team that Jack wanted to continue to control JJF, along with his (Jack's) control over the Board.

## IV.     FACTUAL ALLEGATIONS

### A.     **The Company**

67.     JJF is a Maryland corporation that owns and operates the Fitzgerald Auto Mall, Inc. car dealerships, with over 12 locations in Maryland, Pennsylvania, and Florida.

68.     Prior to the Transaction, the Company was owned by the Fitzgerald family.

69.     Jack Fitzgerald founded JJF in 1974. JJF's current President explained that as Jack

aged, he was looking for an "exit strategy" that avoided substantial estate taxes, and thus "put a lot of effort into changing the estate tax. Some people might say we were tilting at windmills but we put 10 years of effort" into changing the estate tax. "But after we ran into too many roadblocks. . . Jack decided the best exit strategy for him to perpetuate the brand is to do an ESOP, …which allows him to continue his brand **with the leadership team that he really looks at as family** over the years. . . [which also provides] significant tax benefits. . . " (emphasis added).

### B.     The Sale of the Company to the JJF ESOP

#### 1.     The Company Created a Willing Buyer through the ESOP

70.     On January 31, 2023, JJF established the ESOP, which was made retroactive to August 1, 2021. The ESOP is a pension plan within the meaning of ERISA § 3(2), 29 U.S.C. § 1002(2) and is subject to ERISA pursuant to ERISA § 4(a)(1), 29 U.S.C. § 1003(a)(1). The ESOP is also an individual account plan where current and former employees have an individual account that must purchase JJF stock as employer contributions are made. ERISA § 407(d)(6), 29 U.S.C. § 1107(d)(6); 29 C.F.R. § 2550.407d-6 (defining "employee stock ownership plan").

71.     The employer contributions, which invested in employer stock, are part of employee compensation and comprise an important part of employee retirement savings.

72.     The ESOP's 2023 Form 5500 states that it had 2,051 participants with account balances as of the end of the plan year.

#### 2.     The Sellers Appointed Richard Heeter as Trustee Solely to Approve the Transaction

73.     On July 31, 2022, the Company, acting through the Board of Directors, appointed Richard A. Heeter as Trustee of the ESOP solely for purposes of the Transaction. Jack Fitzgerald executed the appointment on behalf of the Company.

74.     The Board of Directors selected and took action to appoint Heeter as Trustee.

75.     This role required Heeter to (among other things) perform due diligence into JJF's business, negotiate and approve terms for the Transaction that were fair to the ESOP, and ensure that the ESOP paid no more than fair market value ("FMV") for the Company.

76.     The Trust Document explicitly provided that Heeter "will be replaced by Rob Smith, David Jenkins, and Gregg Steinbarth immediately following the transaction." And This provision made clear that the Sellers knew the Transaction would be approved by Heeter, despite the fact that Heeter was supposed  to approve the Transaction if—and only if—it was in the best interest of the ESOP participants and the ESOP paid no more than FMV.

3.     **The Transaction Resulted in a Substantial Payout for the Seller Defendants and Burdensome Debt for the ESOP**

77.     According to a Form 5500 filed with the Department of Labor, the ESOP purchased 1,000,000 shares of the Company's stock on January 31, 2023 for a total price of $441,963,472, representing an average per-share price of $441.96.

78.     To finance the purchase of shares, the ESOP entered into two separate loans, which together created an enormous debt burden for the ESOP.

79.     First, the ESOP took a bank loan of $89,321,858. To finance the remainder of the transaction, the Plan borrowed $331 million from the Sellers in the form of Seller Notes.

80.     The two loans were later refinanced in the amount of $441,963,472 as a loan from the Company to the ESOP. The total debt burden was higher than the original $420 million because of a post-Transaction purchase price adjustment of $16,508,475 and a post-closing adjustment of $5,454,997. On information and belief, the additional $21,963,472 was financed through additional Seller Notes, totaling roughly $355 million in Seller debt.

81.     The loan agreement provides for the loan to be repaid over 39 years. The day before the ESOP Transaction, the Company's Articles of Incorporation were amended to guarantee that,

until the loan was paid off, the Sellers would control a majority of the Board. This provision virtually guaranteed that the Sellers would remain in control of the Company for decades—even after selling 100% of their stock to the ESOP and deriving significant tax benefits for doing so.

82.    The amendment to the Articles of Incorporation specified that Jack Fitzgerald would remain on the Board, along with his chosen directors Defendant Walter J. Skipper and Defendant Gregg Steinbarth.

83.    In addition, to cement the Fitzgerald Family's ongoing control over the Company post-Transaction, the Board Defendants structure the ESOP such that there was an "ESOP Voting Committee" with one member—Jack's son, Defendant John J. Fitzgerald, Jr.—who would direct the Trustee's voting for up to three (3) members of the Board until the Seller Notes were satisfied.

**C.    The Transaction Was Not Fair and Not in the Interest of Plan Participants**

1.    **The ESOP Paid More than Fair Market Value for the Company's Stock**

84.    The purchase price that the ESOP paid ($441,963,472) far exceeded the fair market value of the purchased shares.

85.    According to the ESOP's 2023 financial statements filed with the DOL, the reported value of the acquired JJF stock was only $46.45 million as of January 31, 2024—a nearly 90% reduction from the purchase price just a year earlier.

86.    Although the ESOP ultimately paid $441,963,472 for 100% of the Company's shares, the Seller Defendants and Heeter had originally agreed that the ESOP would purchase those shares for only $420,000,000.

87.    The ESOP ultimately paid more than the originally negotiated price due to a post-Transaction purchase price adjustment of $16,508,475 and a post-closing adjustment of $5,454,997. As a result of the amended purchase price, the Company's total valuation was

increased by almost $22 million without securing the ESOP additional consideration.

88.    Particularly concerning is, when the purchase price adjustment and post-closing adjustment were calculated, Heeter—who had negotiated the $420 million purchase price for the ESOP—was no longer in charge. The Board Defendants had set up the ESOP so that Heeter would be immediately replaced by Smith, Jenkins, and Steinbarth, who were the leadership team that Jack considered "family."  Steinbarth was also one of the Sellers' hand-picked Board members.

89.    The Successor Trustee Defendants, who had discretionary control over the ESOP, caused the additional payments (totaling $22 million) , which were prohibited transactions.

2.    **The Appraisal that Was Used to Justify the Inflated Purchase Price Failed to Properly Account for Several Material Considerations**

90.    The valuation process undertaken by Heeter was flawed. The stock appraisal upon which he relied was based on unrealistic and inflated projections of JJF's future cash flows and earnings; excluded material facts relevant to the valuation; and ignored that the Sellers and Board Defendants would keep control of JJF even after the ostensible 100% sale to the ESOP.

91.    To begin with, the projections were prepared by Jack Fitzgerald and the leadership team (Smith, Jenkins and Steinbarth) that Jack considered "family." These individuals were conflicted because they would receive a large payout from the ESOP transaction or would receive substantial synthetic equity from the Transaction plus the power to award themselves even more synthetic equity.

92.    The unrealistic and inflated projections of JJF's future cash flows and earnings were influenced by the Seller Defendants, who stood to (and did) personally profit from any increased value in the stock price they received from the ESOP. The financial and business information provided by Jack Fitzgerald and his leadership team was inflated due to their significant conflicts of interest. These conflicts were not properly accounted for as part of Heeter's valuation process.

93.     Second, the synthetic equity which went to Jack's leadership team (his "family") substantially diluted the value of JJF stock allocated to employee-participants and were not adequately valued as a drain on the Company's share value and cash flows.

94.     Third, the stock appraisal failed to account for COVID-related supply chain problems, which had drastically inflated the prices of new and used cars and trucks in the months leading up to the Transaction. Indeed, data from the Federal Reserve shows that the price of used cars hit an all-time high in June 2022, seven months before the Transaction.

95.     Between August 2020 and June 2022, used car prices increased every single month for *23 months in a row*. At the 2022 peak, used car prices were 55% more than in August 2020.

96.     Industry experts predicted that these sky-high prices would not last. Indeed, analysts at J.P. Morgan issued a report near the time of the Transaction predicting that used car prices would decline by 10% in 2023. J.P. Morgan also predicted that even new car prices would decline by 2.5% to 5% in 2023. Federal Reserve data shows that, immediately after the ESOP Transaction, used car prices in the United States declined for 19 months in a row.

97.     Heeter's valuation should have taken these anomalous conditions—caused by a once in a century pandemic—when evaluating the Company's growth projections. However, Heeter failed to consider that the Company's gangbusters performance in the months leading up to January 2023 was not indicative of the Company's underlying value, but merely of transitory, fluke economic conditions, driven by a global pandemic, that were already beginning to subside.

98.     Fourth, the stock appraisal also failed to account for the Sellers' continued control over the Company. The price investors are willing to pay for a company's equity is materially affected by the degree of control those investors will receive over the company when they invest.

99.     In connection with the Transaction, the Seller Defendants and Jack's leadership

team (which he considered "family") retained control over the Company.

100.    In fact, the day before the ESOP Transaction, the Company amended its Articles of Incorporation to ensure that—until the ESOP Transaction debt was paid (a projected 39 years into the future)—the Sellers would control a majority of the Board.

101.    Even worse, immediately after the ESOP purchased JJF, Heeter was replaced by Jack's long-term leadership team: Smith, Jenkins, and Steinbarth. Indeed, the Plan's 2023 Form 5500 reports that "[t]he Plan is managed by 3 ***non-independent*** Trustees." (emphasis added). As Smith admitted publicly, Jack wanted an "exit strategy" which "allow[ed] him to continue his brand with the leadership team that he really looks at as family over the years."

102.    Fifth, the appraisal that Heeter utilized to value JJF failed to apply a sufficient discount for lack of marketability to JJF's equity value. As a general matter, an arms-length purchaser is willing to pay more for a highly liquid asset, and less for a highly illiquid asset.

103.    Because JJF stock has always been privately held, there is no public market on which it is traded. JJF stock is far less liquid than stock in public companies like Apple or Meta, whose stock can be bought and sold in seconds to willing buyers.

104.    While ESOP consultants rely heavily on the "put option" in the ESOP Plan Document, that (still limited) liquidity is not available to the ESOP as a whole. In other words, the Plan's "put option" does not provide liquidity for the ESOP to itself liquidate its interest in JJF. Further, the "put option" has substantial restrictions, such as a more than five-year wait period.

105.    Were the ESOP to attempt to sell JJF, it would face many obstacles.

106.    There are very few potential buyers of a 9-figure car dealership chain. The most likely buyer would be a competitor dealer in Maryland. But such a buyer would face difficulties in executing such a purchase.

107.    The most likely interested buyers—competitor dealerships in Maryland—would likely face significant antitrust scrutiny from state and federal authorities given JJF's concentration in Maryland (roughly a dozen dealerships).

108.    Such scrutiny would impose significant legal costs and risks on a potential buyer attempting to navigate regulatory approval. Those costs would reduce the price a third party would pay to purchase JJF. The antitrust concerns provide even more reason that Heeter should have applied a higher discount for lack of marketability.

109.    Any sale to an outside buyer would be extremely difficult due to the financing challenges. This is confirmed by the fact that, here, the Seller Defendants had to self-finance over 75% of the ESOP Transaction through Seller Notes. The Sellers were only able to secure $90 million of bank financing for the $441 million Transaction (20%). A third party buying JJF from the ESOP would likely need to secure far more bank financing to execute the transaction, as the ESOP could not simply issue hundreds of millions of dollars of Notes to make up the difference.

110.    The Sellers' inability to secure more bank financing for the purchase—which they were incentivized to do, as more bank financing would provide them more cash at closing—suggests that no bank was willing to offer more than $90 million in Transaction financing. Because of these financing hurdles, the ESOP would have to find an immensely cash-rich buyer for JJF.

111.    Moreover, the pool of potential buyers is extremely limited—or even non-existent. Thus, the ESOP should have received a massive discount for lack of marketability (DLOM); yet Heeter obtained only a small DLOM, insufficient to address JJF's extremely limited marketability.

112.    Published academic studies have concluded that a proper discount for lack of marketability may be as high as 60% to account for the limited pool of buyers.

**D.    The Trustee Defendants Improperly Approved the Transaction**

113.    Consistent with their fiduciary obligations under ERISA, the Trustee Defendants

were required to ensure that the ESOP did not pay more than fair market value for JJF stock, taking into account all aspects of the Transaction. However, the Trustee Defendants failed to do so and overlooked many important facts (as discussed above) that should have caused it to question (and reject) the sky-high purchase price.

114.    The Trustee Defendants also failed to adequately consider the related ESOP loan terms, the Company loan servicing obligations, and related implications for long term cash flow.

115.    Nor did the Trustee Defendants consider the risk to the ESOP associated with the additional amounts paid to the Sellers (post-transaction), which would be overseen by the Trustee Defendants' replacements—Company insiders Smith, Jenkins, and Steinbarth.

116.    Had the Trustee Defendants adequately considered all material facts, they would have recognized that (a) the purchase price was inflated, (b) it was not prudent and in ESOP participants' interest to complete the Transaction, and (c) the Transaction was designed to benefit the Seller Defendants rather than benefit Plan participants and their beneficiaries.

117.    The Successor Trustee Defendants failed to adequately oversee the post-Transaction purchase price adjustments (totaling $22 million) which caused the ESOP to pay more for the Company without receiving additional shares or consideration.

**E.    The Board Defendants Failed to Exercise Appropriate Care and Loyalty to the Participants**

118.    The Board Defendants failed to prudently appoint the Trustee Defendants. The Board Defendants appointed the Trustee Defendants not because they would conduct a thorough and complete review of the Transaction in participants' best interest, but rather because they would act as a rubber-stamp to approve the Transaction. This is evident from the fact that the Trustee Defendants were immediately replaced by Company insiders (the Successor Trustees) after the Transaction closed.

119.    The Board Defendants also failed to prudently monitor the Trustee Defendants to ensure compliance with ERISA fiduciary requirements. To the contrary, the Board Defendants sought to convince the Trustee Defendants to approve the Transaction, even though they knew from their vantage point as Company insiders that the purchase price was inflated and the Transaction was not in the ESOP participants' best interest.

120.    Because the Board Defendants were at the highest levels of Company management, each of them was involved in the preparation of financial projections and other information used in appraisals of JJF stock prior to and after the ESOP Transaction. This included involvement in the preparation of financial projections for JJF future cash flows and earnings that the Board Defendants knew or should have known were overly optimistic, and which formed the basis of the stock appraisal relied upon by the Trustee Defendants in agreeing to an inflated price.

121.    The Board Defendants were aware of all facts alleged herein because they were Company leaders and members of the Board of Directors who were privy to the relevant events and had access to all relevant information. Due to their conflicts of interests, at no point did the Board Defendants ever raise any red flags or issue any cautionary warnings related to the Transaction. Since the Transaction was consummated, the Board Defendants have failed to take any remedial action or encourage the Company insiders who replaced the Trustee Defendants as ESOP Trustee (Smith, Jenkins, and Steinbarth) to take any remedial action.

## F.    The Seller Defendants Have Retained Some of Their Ill-Gotten Gains Received from the ESOP Transaction

122.    In public videos, senior JJF leadership has explained that Jack Fitzgerald and his family took advantage of substantial tax breaks via the ESOP Transaction. To obtain these tax breaks, the Sellers' Transaction proceeds must be invested in Qualified Replacement Property ("QRP"). In other words, to avoid capital gains taxes on the sale of their JJF stock, Jack Fitzgerald

and the other Seller Defendants invested their proceeds from the ESOP Transaction in "qualified replacement property" pursuant to I.R.C. § 1042.

123.    Under I.R.C. § 1042, the gains on the sale of stock to the ESOP are taxed when the qualified replacement property is sold, and capital gains taxes can be eliminated entirely if the qualified replacement property is held by the Seller Defendants until death. On information and belief, the Seller Defendants still hold their ESOP Transaction proceeds in qualified replacement property to avoid the adverse tax consequences, and Jack Fitzgerald's proceeds remain in the sane qualified replacement property now held by his Estate, which has not been fully settled.

124.    Each Seller Defendant was required under I.R.C. § 1042 to complete a signed Statement of Purchase that identified and declared the QRP they purchased to avoid taxes on their proceeds from the ESOP Transaction. These Statement of Purchase would be filed by each Seller Defendant with their tax return.

## V.    PLAN REPRESENTATIVE ALLEGATIONS

125.    Plaintiffs bring this action derivatively on behalf of the Plan pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3). Plaintiffs seek Plan-wide relief under 29 U.S.C. §§ 1109(a) and 1132(a)(2)-(3); they do not seek individual relief solely for themselves.

## VI.    CLASS ALLEGATIONS

126.    Plaintiffs assert their claims pursuant to Fed. R. Civ. P. 23 on behalf of:

All participants in the JJF Management Services, Inc. Employee Stock Ownership Plan on or after January 31, 2023 who vested in whole or in part under the terms of the ESOP, and those participants' beneficiaries, excluding Defendants and their immediate family members; any fiduciary of the ESOP; and any current or former officers or directors of JJF Management Services, Inc.

127.    **Numerosity.** The Class of approximately 2000 members is so numerous that joinder of all class members is impracticable.

128.    **Commonality.** This case presents numerous common questions of law and fact,

including, but not limited to:

    a.    Whether the Board Defendants are ERISA fiduciaries and the scope of their fiduciary duties;

    b.    Whether the Board Defendants breached their fiduciary duties under ERISA;

    c.    Whether the Successor Trustee Defendants are ERISA fiduciaries, and the scope of their fiduciary duties;

    d.    Whether the Trustee Defendants caused prohibited transactions under ERISA;

    e.    Whether the Seller Defendants are parties in interest as defined by ERISA;

    f.    Whether the Transaction was a prohibited transaction under ERISA;

    g.    The amount of losses suffered by the ESOP as a result of the unlawful conduct alleged herein; and

    h.    The proper form of equitable and injunctive relief.

129.    **Typicality.** Plaintiffs' claims are typical of the claims of other class members because (among other things): (a) Plaintiffs were participants or beneficiaries in the ESOP; (b) Plaintiffs were treated consistently with other ESOP participants and beneficiaries; (c) Plaintiffs suffered the same injuries as other ESOP participants and beneficiaries on account of the ESOP's overpayment for Company stock; and (d) Plaintiffs seek relief on behalf of the Plan as a whole rather than relief that is unique to themselves.

130.    **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the class. Plaintiffs' interests are aligned with the class they seek to represent, and they are committed to the vigorous representation of the class. Plaintiffs' undersigned Counsel is experienced in ERISA litigation and other complex class action litigation. Plaintiffs have no interests antagonistic to or in conflict with the interests of the class that would impair their ability to represent the class.

131.    **Rule 23(b)(1)(A).** Class certification is appropriate under Fed. R. Civ. P. 23(b)(1)(A) because prosecution of separate actions by individual class members would create the

risk of inconsistent or varying adjudications  that would establish incompatible standards of conduct for Defendants relating to the ESOP.

132.    **Rule 23(b)(1)(B).** Class certification is also appropriate under Fed. R. Civ. P. 23(b)(1)(B) because adjudications with respect to individual class members would, as a practical matter, be dispositive of the interests of other ESOP participants and would substantially impair or impede their ability to protect their interests if they are not made parties to this litigation by being included in the class. Further, the relief granted by the Court, including any equitable relief, injunctive relief, or accounting of profits may be dispositive of the interests of other class members.

133.    **Rule 23(b)(2).** Additionally or alternatively, class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(2) because Defendants have acted or refused to act on grounds generally applicable to the Class, making appropriate declaratory and injunctive relief with respect to Plaintiffs and the class as a whole.

134.    **Rule 23(b)(3)**. Additionally or alternatively, class certification is appropriate pursuant to Fed. R. Civ. P. 23(b)(3) because questions of law and fact common to all class members predominate over any questions affecting individual members of the class  and because a class action is superior to other available methods for the fair and efficient adjudication of this action. Common questions related to liability will predominate because Defendants' duties and obligations were uniform with respect to all ESOP participants and therefore all class members. Plaintiffs and all class members have been similarly harmed by the ESOP paying more than fair market value for JJF stock, and common questions as to remedies will also predominate over any individual issues (particularly since relief is sought on behalf of the Plan as a whole). Class certification will be efficient and eliminate the need for unduly duplicative litigation to remedy the unlawful conduct alleged herein. Management of this action as a class action will not present

material difficulties and is in the best interest of the named Parties, the class, and the Court.

## VII.    CAUSES OF ACTION

### Count I - Breach of Fiduciary Duties

**Under ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)(A)-(B)
(Against Trustee Defendants)**

135.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

136.    ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A), requires a plan fiduciary act "for the exclusive purpose of providing benefits to participants and the beneficiaries of the plan."

137.    ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B), requires that a plan fiduciary act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

138.    In the context of a sale of a company/employer to an ESOP, the duties of loyalty under ERISA § 404(a)(1)(A) and prudence under ERISA § 404(a)(1)(B) require a fiduciary to undertake an appropriate investigation to ensure that the ESOP and its participants pay no more than adequate consideration for the company's assets and the participants' accounts in the ESOP and to ensure that all the Transaction terms are fair and in the best interest of participants.

139.    The Trustee Defendants were required to undertake appropriate and independent due diligence and an investigation of the fair market value of JJF stock before approving the Transaction. Among other things, the they were required to conduct a thorough and independent review of the stock appraisal and ensure that reliance on that appraisal was reasonably justified under the circumstances; to investigate the reliability and reasonableness of the management projections for JJF's future revenue, earnings, and cash flow upon which the discounted cash flow method used in the appraisal; to make an honest, objective effort to read and understand the

valuation reports and opinions, and question any uncertain methods and assumptions; to identify, question, and test the underlying financial data and assumptions; determine that the projections were reasonable; and to verify that the conclusions were consistent with the data and analyses.

140.    As alleged above, a prudent and loyal investigation of all the relevant terms, financial projections, and assumptions in connection with the Transaction would have revealed that the aggregate Transaction price of $441,963,472, representing an average per-share price of $441.96, was greater than the fair market value of the JJF stock at the time of the Transaction.

141.    A prudent and loyal investigation by the Trustee Defendants also would have revealed that it was imprudent to approve the financing terms of the Transaction.

142.    A prudent and loyal investigation by Trustee Defendants would have revealed that the Transaction terms, taken together, were not in the best interest of ESOP participants.

143.    By failing to act prudently and loyally in participants' best interests in connection with the Transaction and by approving the Transaction, the Trustee Defendants breached their fiduciary duties under ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)(A)-(B) and caused losses to the ESOP and the retirement accounts of ESOP participants.

144.    The Trustee Defendants are liable to restore these losses and for other appropriate relief under ERISA § 502(a)(2)-(3), 29 U.S.C. § 1132(a)(2)-(3), and ERISA § 409, 29 U.S.C. § 1109, as a result of these fiduciary breaches.

## Count II – Improper Fiduciary Appointment and Monitoring

**In Violation of ERISA § 404(a)(1)(A)-(B), 29 U.S.C. § 1104(a)(1)(A)-(B)
(Against Board Defendants)**

145.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

146.    As members of the Company's Board of Directors, the Board Defendants appointed the Trustee Defendants as the ESOP Trustee.

147.    Following the Trustee Defendants' appointment, the Board Defendants retained the power to remove the Trustee Defendants as the ESOP Trustee but elected to preserve them in that role until the Transaction was consummated, at which point they installed their loyalists Smith, Jenkins, and Steinbarth.

148.    Company board members who are responsible for the selection and retention of Plan fiduciaries are themselves fiduciaries and are subject to ERISA's duties of loyalty and prudence with regard to the selection and retention of their appointed fiduciaries. *See* 29 C.F.R. § 2509.75-8 (D-4). They also have a duty to monitor their appointees.

149.    The Board Defendants breached their fiduciary duties in connection with the appointment of the Trustee Defendants and the Successor Trustee Defendants and then failed to prudently and loyally monitor them. The Board Defendants appointed the Trustee Defendants because they believed they would rubber stamp the Transaction, not because they believed doing so was in the in the interest of the ESOP and its participants and beneficiaries. A prudent investigation would have revealed other candidates who would have done a better job.

150.    The Board Defendants also breached their fiduciary duties by retaining the Trustee Defendants and failing to fulfill their ongoing duty to monitor them to ensure that they were acting in compliance with statutory standards under ERISA. *See* 29 C.F.R. § 2509.75-8 (FR-17) (1975).

151.    Among other things, the Board Defendants:

a.    failed to make sure that the Trustee Defendants had adequate controls, including protections to ensure that they hired competent valuation advisors and did not unreasonably rely on flawed assumptions and inflated projections;

b.    failed to make sure that the Trustee Defendants and their advisors received all material information in connection with the Transaction, including information relating to potential business risks;

c.    failed to make sure that the Trustee Defendants received accurate information and realistic financial projections for due diligence;

d.      failed to monitor the Trustee Defendants' fiduciary processes;

e.      failed to monitor the Successor Trustee Defendants in connection with the significant post-Transaction payments;

f.      failed to review and evaluate the performance of Trustee Defendants and Successor Trustee Defendants, or install impartial fiduciaries who would do so; and

g.      failed to remove the Trustee Defendants and Successor Trustee Defendants when they knew that their performance was inadequate for the reasons described herein.

152.    The Board Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2)-(3), 29 U.S.C. § 1132(a)(2)-(3), for their failure to appropriately appoint and monitor the Trustee Defendants and Successor Trustee Defendants in a manner consistent with ERISA's fiduciary standards.

## Count III – Prohibited Transactions

### In Violation of ERISA § 406, 29 U.S.C. § 1106
(Against the Trustee Defendants)

153.    Plaintiffs incorporate the preceding paragraphs as though set forth herein, including but not limited to the preceding allegations regarding the Trustee Defendants' fiduciary status.

154.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1), requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan."

155.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B), further provides that a plan fiduciary shall not cause the plan to engage in a transaction if he knows or should know that such transaction constitutes the direct or indirect loan of money between the plan and a party in interest.

156.    ERISA § 3(14), 29 U.S.C. § 1002(14) defines a "party in interest" to include

- "any fiduciary . . . of such employee benefit plan"

- "an employer any of whose employees are covered by such plan"

- "an employee, officer, director . . . or a 10 percent or more shareholder" of an employer whose employees are covered by the ESOP

- "a relative (as defined in paragraph (15)) of any individual described in subparagraph (A), (B), (C), or (E)[.]"

29 U.S.C. § 1002(14)(A), (C), (H), (F).

157.    The Seller Defendants are parties in interest to the ESOP within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14) because, *inter alia*, they were fiduciaries to the Plan; employees, officers, directors, and/or large shareholders of the Company whose employees were covered by the Plan; and/or relatives of Plan fiduciaries.

158.    The Company is also a party in interest to the ESOP because it is an employer whose employees are covered by the Plan.

159.    The Trustee Defendants, acting as fiduciaries of the ESOP, approved and caused the ESOP to purchase 1,000,000 shares of Company stock from the Seller Defendants, who were parties in interest to the ESOP. This was a prohibited transaction because the Transaction constituted an exchange of property between the ESOP and the Seller Defendants in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A) and a transfer of the ESOP assets to the Seller Defendants in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

160.    Thereafter, each individual payment to the Seller Defendants by the ESOP constituted another exchange of property between the ESOP and the Seller Defendants in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP assets to the Seller Defendants in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

161.    The Trustee Defendants also caused the ESOP to borrow over $330 million from

the Seller Defendants and, later, a total of $441 million from the Company, which constituted prohibited transactions in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

162.    Each payment by the ESOP of principal or interest to the Seller Defendants or to the Company in connection with these loans constitutes an independent violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

163.    The Trustee Defendants knew or should have known that the foregoing transactions were prohibited and caused losses to the ESOP and its participants.

164.    The Trustee Defendants are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109 and ERISA § 502(a)(2)-(3), 29 U.S.C. § 1132(a)(2)-(3) for the prohibited transactions set forth herein.

<u>**Count IV – Prohibited Transactions**</u>

**In Violation of ERISA § 406, 29 U.S.C. § 1106**
**(Against the Board Defendants)**

165.    Plaintiffs incorporate the preceding paragraphs as though set forth herein, including but not limited to the preceding allegations regarding the Board Defendants' status as fiduciaries and the Seller Defendants' status as parties in interest.

166.    The ESOP's purchase of 1,000,000 shares of JJF common stock from the Seller Defendants constituted a direct or indirect exchange of property between the ESOP and parties in interest in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of ESOP assets to the Seller Defendants in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

167.    Thereafter, each individual payment to the Seller Defendants by the ESOP constituted another indirect exchange of property between the ESOP and the Seller Defendants in violation of ERISA § 406(a)(1)(A), 29 U.S.C. § 1106(a)(1)(A), as well as a transfer of the ESOP

assets to the Seller Defendants in violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

168.    The Seller Notes and related loan with the Company constituted separate prohibited transactions in violation of ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B).

169.    Each payment by the ESOP of principal or interest to the Seller Defendants or to the Company in connection with these loans constitutes an independent violation of ERISA § 406(a)(1)(D), 29 U.S.C. § 1106(a)(1)(D).

170.    The Board Defendants knew or should have known that the foregoing transactions were prohibited. They caused the foregoing transaction through their appointment and failed monitoring of the Trustee Defendants and the Successor Trustee Defendants.

171.    Because the Board Defendants breached their fiduciary duties in appointing and failing to monitor the Trustee Defendants' actions during the relevant period (see Count II above) and the Successor Trustee Defendants' actions, each of them caused the numerous prohibited transactions and are liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109 and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) in connection with those prohibited transactions.

### Count V – Prohibited Transactions

**In Violation of ERISA § 406, 29 U.S.C. § 1106 and Claim For Equitable Relief Under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3)
(Against the Seller Defendants)**

172.    Plaintiffs incorporate the preceding paragraphs as though set forth herein, including but not limited to the preceding allegations regarding the Board Defendants' status as fiduciaries and the Seller Defendants' status as parties in interest.

173.    The Seller Defendants knew or should have known that the transactions alleged in Cout III were prohibited.

174.    To the extent the Seller Defendants are not found to be fiduciaries who caused the prohibited transactions alleged in this Count, they are still liable for equitable relief under *Harris*

*Trust and Savings Bank v. Salomon Smith Barney, Inc.*, 530 U.S. 238 (2000) because each of them knowingly participated in the prohibited transactions and the Trustee Defendants' and Successor Trustee Defendants' fiduciary breaches as described herein.

- As owners and leaders of the Company, the Seller Defendants were involved in and directed the preparation of the financial projections underlying the stock appraisal relied upon by the Trustee Defendants, which was the basis of the purchase price the ESOP paid for the Company.

- Given their role in the preparation of the Company's financial statements and its operations for many years, the Seller Defendants knew or should have known that the financial and business projections underlying the stock valuation were unrealistic and unreliable and that the purchase price exceeded the fair market value of the Company.

- The Seller Defendants knew or should have known that the Company faced idiosyncratic risks because of COVID-related supply chain disruptions.

- The Seller Defendants knew or should have known that, despite selling 100% of the Company's shares outstanding to the ESOP, they retained control over the Company due to their ability to appoint a majority of the Board, and their ability to remove the Trustee without cause.

- The Seller Defendants knew or should have known that the Transaction was highly leveraged, and the Company bore all risk of default in connection with the underlying loans.

- The Seller Defendants knew or should have known that the Company was obligated to make contributions to the ESOP in an amount sufficient to cover the principal and interest payments on the loans, which functioned as a significant drag on its future cash flows.

- Based on their knowledge, position, and unique access to the Company's financial and business information, the Seller Defendants knew or should have known that the Trustee Defendants had no basis for approving the Transaction or the continuing payments to the Seller Defendants but participated in the Transaction and accepted those continuing payments anyway in conscious disregard of the ERISA violations described herein.

- Based on their knowledge, position, and unique access to the Company's financial and business information, the Seller Defendants knew or should have known that the Successor Trustee Defendants did not fulfill their fiduciary duties in approving or allowing the additional post-Transaction payments of almost $22 million to the Seller Defendants.

175.    Accordingly, the Seller Defendants are liable as non-fiduciary parties in interest for disgorgement and other appropriate equitable relief under ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3).

- 33 -

## Count VI – Prohibited Transactions

### In Violation of ERISA § 406, 29 U.S.C. § 1106
### (Against the Successor Trustee Defendants)

176.    Plaintiffs incorporate the preceding paragraphs as though set forth herein, including but not limited to the preceding allegations regarding the Successor Trustee Defendants' status as fiduciaries.

177.    ERISA § 406(a)(1), 29 U.S.C. § 1106(a)(1) requires that a plan fiduciary "shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect (A) sale or exchange, or leasing, of any property between the plan and a party in interest," or a "(D) transfer to, or use by or for the benefit of a party in interest, of any assets of the plan."

178.    ERISA § 406(a)(1)(B), 29 U.S.C. § 1106(a)(1)(B) further provides that a plan fiduciary shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes the direct or indirect loan of money between the plan and a party in interest.

179.    The two additional payments totaling almost $22 million which the ESOP made to the Seller Defendants as a post-Transaction price adjustment and a post-closing adjustment were both transfers of plan assets and exchanges of property with parties in interest.

180.    The Successor Trustee Defendants caused those prohibited transaction as they alone had discretionary power of the ESOP's assets and operations at the time the $22 million in payments occurred.

181.    They caused the payments of a total of $22 million to the Seller Defendants, for which the ESOP received no additional stock or value and are thus liable for appropriate relief under ERISA § 409, 29 U.S.C. § 1109 and ERISA § 502(a)(2), 29 U.S.C. § 1132(a)(2) in connection with those prohibited transactions..

## Count VII – Co-Fiduciary Liability

**Under ERISA § 405(a), 29 U.S.C. §§ 1105(a)**
**(Against Board Defendants and Successor Trustee Defendants)**

182.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

183.    ERISA § 405(a), 29 U.S.C. § 1105(a) provides that a fiduciary "with respect to a plan shall be liable for a breach of fiduciary responsibility of another fiduciary with respect to the same plan . . . if he participates knowingly in . . an act or omission of such other fiduciary, . . . or [] he has knowledge of a breach by such other fiduciary, unless he makes reasonable efforts under the circumstances to remedy the breach."

184.    As discussed above, the Board Defendants had knowledge of the Trustee Defendants' fiduciary breaches and the prohibited transactions set forth herein, and knowingly participated in and facilitated those prohibited transactions.

185.    The Board Defendants made no effort, much less reasonable efforts, to remedy those fiduciary breaches and prohibited transactions.

186.    The Successor Trustee Defendants also had knowledge of the Trustee Defendants' fiduciary breaches and prohibited transactions, but made no effort to remedy them when they replaced the Trustee Defendants.

187.    Based on the foregoing, the Board Defendants and Successor Trustee Defendants are liable as co-fiduciaries under ERISA § 405(a), 29 U.S.C. § 1105(a), for the Trustee Defendants' fiduciary breaches and other ERISA violations, and subject to appropriate relief under ERISA § 409, 29 U.S.C. § 1109, and ERISA § 502(a)(2)-(3), 29 U.S.C. § 1132(a)(2)-(3).

## Count VIII – Indemnification Claim

**Under ERISA § 410(a), 29 U.S.C. § 1110(a)**
**(Against Trustee Defendants, Board Defendants and Successor Trustee Defendant)**

188.    Plaintiffs incorporate the preceding paragraphs as though set forth herein.

189.    ERISA § 410(a), 29 U.S.C. § 1110(a) provides that "any provision in an agreement or instrument which purports to relieve a fiduciary from responsibility or liability for any responsibility, obligation, or duty under this part shall be void as against public policy."

190.    Indemnification agreements requiring a company owned by an ESOP to indemnify the ESOP fiduciaries are prohibited as they "would have the same result as an exculpatory clause, in that it would, in effect, relieve the fiduciary of responsibility and liability to the plan by abrogating the plan's right to recovery from the fiduciary for breaches of fiduciary obligations." 29 C.F.R. § 2509.75-4 (1975).

191.    The Plan Document provides that "[t]The Board of Directors, the Plan Administrator or any person to whom duties and responsibilities have been allocated or delegated shall be indemnified and held harmless by the Company from any expense or liability hereunder unless due to or arising from gross negligence or willful misconduct of the Board of Directors, the Plan Administrator, or such person, as the case may be."

192.    JJF's governing documents likewise provide indemnification to Board members for any defense costs or liability associated with acts or responsibilities associated with their Board membership.

193.    These governance provisions are void under ERISA § 410(a), 29 U.S.C. § 1110(a), as applied to any liability in this case.

194.    The Trustee Defendants, Board Defendants, and Successor Trustee Defendants are fiduciaries to the Plan within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).

195.    If the indemnification provisions set forth above were exercised to indemnify Defendants for the ERISA violations alleged in this case, it would abrogate the ESOP's right to recovery from a breaching fiduciary and effectively require the ESOP to bear the cost of liability

itself.

196.    Plaintiffs seek appropriate relief under ERISA §§ 502(a)(2) and/or 502(a)(3), 29

U.S.C. §§ 1132(a)(2) and/or 1132(a)(3) to enjoin Defendants from relying on this indemnification

provision in connection with any liability or costs of defense in this case.

## VIII.   PRAYER FOR RELIEF

197.    WHEREFORE, Plaintiffs, on behalf of the Plan and the class, pray that judgment

be entered against Defendants on each Count and that the Court grant all available relief to address

the ERISA violations referenced herein, including (among other things):

a.    Declaring that the Trustee Defendants, Board Defendants, and Successor Trustee Defendants have caused prohibited transactions in violation of ERISA § 406(a), 29 U.S.C. § 1106(a);

b.    Declaring that the Trustee Defendants and Board Defendants have each breached their fiduciary duties under ERISA;

c.    Enjoining the Board Defendants from further violations of their fiduciary responsibilities, obligations, and duties;

d.    Removing Robert M. Smith, Jr., David Jenkins, and Gregg Steinbarth from their positions as the Trustee of the JJF ESOP and barring them from serving as a fiduciary of the ESOP in the future;

e.    Appointing a new, independent fiduciary to manage the ESOP and ordering the costs of such independent fiduciary be paid for by the Board Defendants;

f.    Ordering each fiduciary found to have violated ERISA to restore all losses resulting from the prohibited transaction(s) and fiduciary breaches they caused and to disgorge all profits made through use of assets of the ESOP;

g.    Ordering the Seller Defendants to disgorge all ill-gotten ESOP proceeds in connection with the ESOP Transaction (and profits thereon) and deposit them into a constructive trust for the benefit of all current and former ESOP participants;

h.    Ordering that Defendants provide other appropriate equitable relief to the ESOP, including but not limited to providing an accounting for profits, ordering surcharge against Defendants to restore losses to the ESOP, rescinding or reforming the Transaction, and imposing a constructive trust and/or equitable lien on any funds wrongfully held by any of the Defendants;

- 37 -

i.      Enjoining Defendants from seeking indemnification or exculpation from JJF Management Services, Inc. or the ESOP for their violations of ERISA;

j.      Enjoining the Seller Defendants from dissipating any of the proceeds they received from the Transaction held in their actual or constructive possession until the ESOP participants' rights can be adjudicated;

k.      Enjoining the Seller Defendants from transferring or disposing of any of the proceeds they received from the Transaction to any person or entity, which would prejudice, frustrate, or impair the ESOP participants' ability to recover the same;

l.      Reformation and/or recission of the Seller Notes to extinguish some or all of the ESOP direct or indirect debt owed to any Sellers or Defendants.

m.      Voiding all transfers of ESOP proceeds to any person or entity who did not pay equivalent value for such proceeds;

n.      Requiring Defendants to pay attorneys' fees and costs pursuant to ERISA § 502(g), 29 U.S.C. § 1132(g) and/or ordering payment of fees and expenses to Plaintiffs' Counsel on the basis of the common benefit or common fund doctrine out of any money recovered for the class;

o.      Awarding pre-judgment interest and post-judgment interest; and

p.      Awarding such other and further relief that the Court determines to be appropriate pursuant to ERISA §§ 502(a)(2) and/or 502(a)(3), 29 U.S.C. §§ 1132(a)(2) and/or 1132(a)(3), or pursuant to Rule 54(c) of the Federal Rules of Civil Procedure, or that is otherwise equitable and just.

Dated: August 15, 2025

Respectfully submitted,

s/ Zachary Krowitz
Michelle C. Yau (*pro hac vice* forthcoming)
Ryan A. Wheeler (*pro hac vice* forthcoming)
Allison C. Pienta (*pro hac vice* forthcoming)
Elizabeth McDermott (D. Md. Bar No. 31169)
Zachary Krowitz (D. Md. Bar No. 22370)
**Cohen Milstein Sellers & Toll PLLC**
1100 New York Ave. NW ● Eighth Floor
Washington, DC 20005
Tel: (202) 408-4600
Fax: (202) 408-4699
*myau@cohenmilstein.com*
*rwheeler@cohenmilstein.com*
*apienta@cohenmilstein.com*
*emcdermott@cohenmilstein.com*
*zkrowitz@cohenmilstein.com*

Jacob T. Schutz (*pro hac vice* forthcoming)
**Cohen Milstein Sellers & Toll PLLC**
400 South 4th Street # 401-27
Minneapolis, MN 55415
Tel.: (202) 408-4600
Fax: (202) 408-4699
*jschutz@cohenmilstein.com*

*Counsel for Plaintiffs and the Proposed Class*